ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| ECC International Constructors, LLC | ) | ASBCA No. 59643 |
| | ) | |
| Under Contract No. W912ER-10-C-0054 | ) | |

APPEARANCES FOR THE APPELLANT:    R. Dale Holmes, Esq.
Michael H. Payne, Esq.
  Cohen Seglias Pallas Greenhall & Furman PC
  Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Sarah L. Hinkle, Esq.
Geoffrey A. Mueller, Esq.
Kathryn G. Morris, Esq.
Matthew Tilghman, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE MCILMAIL ON THE GOVERNMENT'S
PARTIAL MOTION TO DISMISS FOR LACK OF JURISDICTION

The government moves for the dismissal of parts of the appeal for lack of jurisdiction, saying that appellant, ECC International Constructors, LLC (ECCI), did not provide sums certain for what the government (U.S. Army Corps of Engineers or USACE) says are separate claims.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

In September 2010, the parties contracted for ECCI to design and construct a military compound in Afghanistan (R4, tab 5 at 2, 179 § 1.1). On May 2, 2014, ECCI submitted to the contracting officer a demand for $3,767,856.32 "for the design, procurement, logistics and construction cost impacts directly attributable to the extra work caused and directed by the Government during execution of the project," more specifically: (1) design costs; (2) material procurement, shipping and labor costs associated with communications systems; (3) material procurement, shipping and labor costs associated with electrical systems; (4) material procurement, shipping and labor costs associated with heating ventilation and air conditioning (HVAC) systems; and (5) miscellaneous extra work (R4, tab 75 at 6). The submission further breaks the

$3,767,856.32 demand amount into 23 direct cost items totaling $3,212,831.76, before adding general and administrative costs, fee, and bond, to arrive at the claimed total amount of $3,767,856.32 (R4, tab 75 at 55, 77-78). The government challenges the Board's jurisdiction to entertain nine of those direct cost items: (1) Additional Outlets and Changed Configurations; (2) Additional and Changed Flexible Metal Conduit; (3) Legrand Raised Floor Communications Outlets; (4) 144 Port Fiber Optic Combination Units; (5) Trunk and Splice OSP Configuration, (6) Changed Direction Regarding Design and Provision of Uninterruptible Power Supply (UPS) System; (7) UL/R410 HVAC and Change to Accommodate Schedule; (8) Server Cabinets and Relay Racks; and (9) Additional Ladder Rack and Cable Tray (gov't mot. at 4-5).

1.     *Additional Voice/Data and Printer Outlets and Changes to Configuration of Non-Office Outlets*

In its submission to the contracting officer, ECCI makes a single request for $989,042.80 for (at least): (1) the government's alleged "direction to 'round up' the number of outlets in each space determined by dividing the floor area of a particular office by the [contract] outlet density when the calculation resulted in less than a whole number"; (2) the government's alleged direction to provide "two voice and two data connectors" every 4.5 square meters of floor area in certain office spaces; (3) the government's alleged direction "to provide a standard 'Office' wall outlet with two voice and two data outlets in a six-plex plate in all non-office spaces"; (4) the government's alleged direction that "raised access floor areas in the [Tactical Operations Center (TOC)] be equipped with one Secure, one Above Secret and one Non-Secure raised floor box per 4.6 square meters of raised floor area"; and (5) the government's alleged direction that ECCI provide additional non-Secure and Secure printer outlets (R4, tab 75 at 15-18).

a. *Rounding Up*

With respect to "rounding up," ECCI in its submission to the contracting officer states:

> The communications systems design reviewer directed that all room outlet calculations need to be reviewed to "ensure the number meets the requirements of [the contract]." A follow up review conference revealed that the reviewer was insisting on implementation of his interpretation of the contract requirements regarding the number of outlets required in each building. Essentially, he was directing that the outlets density provisions in [the contract] be implemented with complete disregard of other applicable contract provisions or conditions. This included his direction to "round up" the number of outlets in each space determined by dividing the

2

floor area of a particular office by [the contract] outlet density
when the calculation resulted in less than a whole number.

(R4, tab 75 at 15)

    *b. Two Voice and Two Data Connectors Every 4.5 Square Meters*

With respect to two voice and two data connectors every 4.5 square meters of
floor area in certain office spaces, ECCI states:

> The I3A (Department of the Army, Technical Criteria for the
> Installation Information Infrastructure Architecture),
> Paragraph 2.3.5.2, QUARTERS requires an outlet with just
> one connector compared to the two connectors in ECCI's
> original design and the four connectors directed by the
> Government. The I3A states,
>
> > *"For U.S. Army barracks projects, provide one 8-pin
> > modular (RJ45 type) connector in a single gang outlet
> > faceplate, labeled voice use, and one CATV outlet per
> > sleeping/living area."*
>
> So the communications system design reviewer's direction
> . . . results in four times the cable and keystone modules
> required by the I3A and two times the number proposed in
> ECCI's design.
>
> . . .
>
> So while the Government was directing ECCI install a
> barracks communications system costing more than four
> times the Army's normal barracks communication system,
> there was apparently no requirement at all. The Government
> also directed the same outlet configuration for sleeping rooms
> in other buildings . . . .
>
> Similarly, for non-barracks, non-office spaces, the I3A only
> requires one voice and one data connector. And finally, the
> I3A only requires one outlet with one each voice and one data
> connector every 7.5 square meters of floor area in
> Headquarters, Administrative and Office spaces as compared
> to the 4.5 square meters and two voice and two data

3

connectors the communications system design reviewer
directed.

(R4, tab 75 at 16-17 (italics in original))

  *c. Additional Non-Secure and Secure Printer Outlets*

   With respect to the government's alleged direction that ECCI provide additional non-Secure and Secure printer outlets, ECCI states:

> [T]he Government communications design reviewer directed
> ECCI to provide a standard "Office" wall outlet with two
> voice and two data outlets in a six-plex plate in all non-office
> spaces.  However, the barracks rooms, sleeping rooms in
> other buildings, maintenance spaces, game rooms, etc.
> throughout the project are not offices, and the contract is
> silent regarding the outlet configuration for non-office spaces
> except for those with raised computer flooring.

(R4, tab 75 at 16)

  *d. Raised Access Floor Areas in the TOC Be Equipped with One Secure, One
   Above Secret and one Non-Secure Raised Floor Box Per 4.6 Square Meters*

   With respect to the government's alleged direction that "raised access floor areas in the TOC be equipped with one Secure, one Above Secret and one Non-Secure raised floor box per 4.6 square meters of raised floor area," ECCI states:

> The communications system design reviewer also directed
> that raised access floor areas in the TOC be equipped with
> one Secure, on Above Secret and one Non-Secure raised floor
> box per 4.6 square meters of raised floor area, equating to
> 30 outlet groups in each of the four TOC open work areas,
> which have a calculated . . . occupancy of 15.  However, the
> raised floor boxes described in [the contract] are configured
> to service two work stations per floor box.  ECCI's position is
> that one floor box was required for every two work stations,
> which would number 15.  Clearly, <u>it is not</u> the intent of the
> contract to install enough outlets to serve 60 work stations in
> a space which has a calculated . . . occupancy of 15, nor to
> install enough outlets to serve 240 work stations in the small
> TOC facility when the design population for the entire project
> that includes major 12 non-barracks buildings is just 400.

(R4, tab 75 at 17 (emphasis in original, alteration added))

> ### e. Additional Non-Secure and Secure Printer Outlets

With respect to the government's alleged direction that ECCI provide additional non-Secure and Secure printer outlets, ECCI states:

> Based on the direction to increase the number of outlets throughout the project, the communications system design reviewer also directed a significant increase in the number of non-Secure printer outlets, based on the voice/ data outlet increase. The contract requires just 15 Secure printer outlets for the entire project with the location of both Secure and non-Secure printer outlets to be provided by the COR [Contracting Officer's Representative]. These locations were not provided by the COR or the communications system design reviewer until the 3rd 100% submission. The direction finally provided resulted in a total of 23 Secure printer outlets throughout the project compared to the required 15.

(R4, tab 75 at 17-18 (bracketed material added))

We find that the above constitutes at least five sets of materially different, unrelated operative facts: (1) one concerning the government's alleged direction to "round up" the number of outlets in each space; (2) one concerning the government's alleged direction to provide two voice and two data connectors every 4.5 square meters of floor area in certain office spaces; (3) one concerning the government's alleged direction "to provide a standard 'Office' wall outlet with two voice and two data outlets in a six-plex plate in all non-office spaces"; (4) one concerning the government's alleged direction that "raised access floor areas in the TOC be equipped with one Secure, one Above Secret and one Non-Secure raised floor box per 4.6 square meters of raised floor area"; and (5) one concerning the government's alleged direction that ECCI provide additional non-Secure and Secure printer outlets.

## 2. Additional and Changed Flexible Metal Conduit

In its submission to the contracting officer, ECCI makes a single request for $191,328.07 for "additional and changed flexible metal conduits for raised floor communications outlets" (R4, tab 75 at 19-21). ECCI states that "[c]ommunications system design reviewer comment 4331500 first insisted the flexible conduit servicing raised floor communications outlets be UL listed *and* that ECCI provide an 'extra' conduit to each box when there are no such requirements in the contract" (R4, tab 75

5

at 19 (emphasis added)). We find that those constitute two sets of materially different, unrelated operative facts: one concerning the alleged government insistence that outlets be UL listed, and one concerning the alleged government insistence that ECCI provide extra conduit.

### 3. *Legrand Raised Floor Communications Outlets*

In its submission to the contracting officer, ECCI makes a single request for $51,471.07 for its Legrand Raised Floor Communications Outlets claim (R4, tab 75 at 21-22). ECCI explained to the contracting officer that:

> ECCI's 100%, [sic] design submissions through 4 January 2013 reflected six gang raised access floor boxes. However, the Governments [sic] directed change to British Standard [BS] outlets required ECCI to re-evaluate the size and configuration of the boxes. In response to the design reviewer's backcheck recommendation for comment 4329826 stating *"A cut sheet for the floor box is required in this design"*; ECCI responded on 22 Feb 2013 that, *"DIN outlets no longer required.* ***British standard outlets being evaluated*** *for use within the* ***floor box recommended by the Reviewer****."* The floor box "recommended" by the reviewer (Mr. Hopkins)[1] was the Legrand Evolution Series eight gang box. However, the box would not accommodate two duplex BS outlets.
>
> After "recommending" the Legrand floor box, Mr. Hopkins [then] explicitly directed its use on 18 March 2013 despite ECCI's concerns that it was not compatible with the BS outlets.
>
> . . .
>
> The ultimate solution to fitting the directed BS outlets into the directed Legrand box required an increase in box size from six to eight gang and a special order electrical mounting bracket. Additionally, because Mr. Hopkins had also directed that three 35 mm flexible conduits be connected to each box instead of the contractually required one 25 mm conduit

---

[1] Chip Hopkins was the government's design reviewer (R4, tab 75 at 18).

> > (addressed previously), special additional 2 inch diameter
> > knockout plates were also required.
>
> > After determining the above solution, ECCI submitted eight
> > gang Legrand boxes in its construction submittal on 12 May
> > 2013 and they were approved immediately.

(R4, tab 75 at 21-22 (underscored emphasis and bracketed material added, other emphasis in original))  ECCI also explained that:

> > However, after [the eight gang Legrand boxes] arrived on
> > site, they still required unexpected field modifications in
> > order to fit the BS outlets onto the mounting bracket.  The
> > field modifications involved cutting and filing the bracket
> > cutouts so the BS outlets would fit.

> > In summary, the Government's inappropriate direction to use
> > Legrand outlet boxes, in conjunction with the modification
> > requiring BS outlets, resulted in ECCI having to procure eight
> > gang Legrand boxes that required custom ordered parts and
> > field modifications instead of a contractually compliant six
> > gang box requiring no modification.  The delay in resolving
> > this issue required ECCI to airfreight the boxes from the US
> > and incur significantly increased the cost of materials and
> > installation.

(R4, tab 75 at 22)  We find that the above constitutes at least two sets of materially different, unrelated operative facts:  one concerning the alleged government direction to use Legrand outlet boxes, and one concerning the alleged government direction that "three 35 mm flexible conduits be connected to each box instead of the contractually required one 25 mm conduit."

*4.     144 Port Fiber Optic Combination Units (FOCUs)*

In its submission to the contracting officer, ECCI makes a single request for $35,535.28 for the government's alleged direction that ECCI:  (1) provide "144 port FOCU's when 48 port units were more than sufficient," and (2) provide "additional FOCU's for single mode fiber that were not needed" (R4, tab 75 at 30-31).  ECCI states:

Mr. Hopkins directed that *"The FOCUs for the OSP* [outside plant][2] *have to be a four RMU high unit to handle 144 strands."* ECCI disagreed but . . . Mr. Hopkins continued to insist that all FOCUs have 144 ports instead of the contract specified minimum size of 48 ports . . . .

Further, . . . Mr. Hopkins directed that, *"The single mode and multimode fiber cannot be terminated in the same combination unit, whether there is a divider or not. A variation for consolidation will not be entertained."* . . . .

This direction resulted in additional unneeded FOCUs in two story buildings. For example, in the case of the two story barracks, Mr. Hopkin's [sic] direction resulted in the first floor relay rack having three FOCUs with 288 ports when there are only 36 fibers requiring termination.

(R4, tab 75 at 30-31 (bracketed material added, emphasis in original)) We find that the above constitutes two sets of materially different, unrelated operative facts: one concerning the alleged government direction to provide 144 port FOCU's, and one concerning the alleged government direction to provide additional FOCU's.

5.     *Directed Trunk and Splice OSP Fiber Configuration*

In its submission to the contracting officer, ECCI makes a single request for $81,256.21 for the government's alleged direction that (1) ECCI provide OSP fiber arranged in a "trunk and splice" configuration instead of ECCI's proposed "star (homerun) topology," and (2) ECCI provide that "the OSP fiber optic cable include 25% space capacity" (R4, tab 75 at 32-34). ECCI states:

The communications system design reviewer directed during his 65% review that the OSP fiber cable be arranged in his desired "trunk and splice" configuration. ECCI non-concurred with his direction . . . .

. . .

---

[2] "OSP" and "outside plant" evidently derive from the "'United States Army Information Systems Engineering Command Worldwide Outside Plant Design and Performance Requirements' (OSPDPR)" (R4, tab 75 at 33).

8

It is the position of ECCI and the DOR [designer of record] that the most appropriate design for any "customer owned outside plant" is direct home runs.

. . .

Additionally, Mr. Hopkins had directed that OSP fiber cable include 25% space capacity. The ECCI DOR has attempted to accommodate his requests and added additional fiber not required by the contract. However, during his review of ECCI's 100% communications system design submission in November 12, [sic] Mr. Hopkins directed the number of fibers be further increased:

> *"The OSP does not have the 25% spare capacity as required in the [request for proposals]. When the size of the cable changes, all of the cable labels will more than likely change AND, additional cables may have to be added which will change the design considerably."*

(R4, tab 75 at 32-33 (emphasis in original, bracketed material added)) Finally, ECCI identifies the requested $81,256.21 as "the additional cost associated with the Government's direction to provide a trunk and splice OSP configuration *and* to provide additional fibers" (R4 tab 75 at 34 (emphasis added)). We find that the above constitutes two sets of materially different, unrelated operative facts: one concerning the government's alleged direction that ECCI provide OSP fiber in a trunk and splice configuration, and one concerning the government's alleged direction that ECCI provide OSP fiber optic cable that included 25% spare capacity.

6.     *Changed Direction Regarding Design and Provision of Uninterruptible Power Supply (UPS) System*

In its submission to the contracting officer, ECCI requests $67,721 for the government's alleged direction that ECCI provide a UPS system (R4, tab 75 at 40). ECCI states that initially, the government directed ECCI to refrain from designing and installing a UPS system, but later directed ECCI to provide such a system without, apparently, specifying the size of the system (R4, tab 75 at 39). ECCI states that it notified the government that it intended to provide a 120 KVA system, explaining that:

> *This significant change in direction at this late stage of the project will impact schedule and cost, so we will submit our request for equitable adjustment or, preferably, our response to a Government RFP as soon as possible.*

9

(R4, tab 75 at 39-40 (italics in original))  ECCI states that, in response, the government directed that ECCI instead provide a 200 KVA UPS system (R4, tab 75 at 39-40).  ECCI responded that:

> "ECCI will proceed with completing the design and providing the system.  We disagree with the Government's assessment of the required system size and stand by our determination that a 120 KVA system is appropriate and meets the stated requirements.  Additionally, an optional maintenance bypass switch is not specified in the contract requirements, and the unit only requires minimum 30 minute battery operation during power failure.  However, based on your direction, we will proceed with providing the 200 KVA systems with maintenance bypass and extended battery backup **and will include the additional costs and time associated with the larger system and the late timing of this direction in a Request for Equitable Adjustment** to be submitted as soon as possible."

(R4, tab 75 at 39 (italics in original, boldface added))  ECCI further states that:

> The Government's direction to provide a 200 KVA system is based on improperly ignoring USACE's standard demand, load and coincidence factors and enforcing erroneous "previous guidance" to provide 20% in additional capacity that is not required by the contract.  An available 200 KVA system could not be identified, so ECCI was forced to procure and airfreight a 225 KVA capable system and bypass switch.  Late arrival of the much larger than required system and bypass switch required significant rework in the UPS room prior to installation of the system.  This [claim] is for the cost of the larger system and switch, airfreight and rework in the UPS room.

(R4, tab 75 at 40)  We find that the above constitutes at least two sets of related materially different, unrelated operative facts:  one concerning the government's allegedly belated direction to provide a UPS system, and one concerning the government's alleged direction to provide a UPS system larger than 120 KVA.

10

*7. HVAC Systems*

In its submission to the contracting officer, ECCI makes a request for $878,675.34 for "the Government's direction to provide UL equipment using R410 and its subsequent directed acceleration and phased turnover" (R4, tab 75 at 48). ECCI states:

> ProjNet Comment 4131009 from the Mechanical Design reviewer . . . was the first indication that the Government was expecting UL listed HVAC equipment. ECCI's response to that comment was that UL listed equipment was not a requirement . . . .
>
> On 29 May 2012, ECCI submitted its first HVAC product data . . . .
>
> . . .
>
> [O]n 18 Jun 12 USACE provided new review comments and again disapproved the submittal . . . . The comments were primarily based on the Government's overarching requirement that the equipment be:
>
> 1.  UL listed . . . .[3]
> 2.  Use R410 refrigerant
>
> So the Government disapproved the proposed equipment, in part, for not being UL listed . . . . ECCI promptly addressed all review comments . . . .

(R4, tab 75 at 42-43) Among those comments, ECCI states that "the use of R22 in new equipment in Afghanistan . . . is actually in full compliance with . . . our contract." (R4, tab 75 at 43 (italics deleted)) ECCI further states:

> Despite ECCI's detailed explanation of its position, the Government refused to acknowledge that non-U.S. material was allowed by the contract and issued [an August 5, 2012 letter] restating its position that UL listed material was required because "100 % cleared for construction specifications" had inadvertently and incorrectly included those requirements. The Government maintained that the

---

[3] ECCI also (and elsewhere) references an alleged testing requirement, "per ANSI/ASHRAE," that we find unnecessary to include.

specifications could not be revised by the Contractor after "clearance for construction" had been issued. However, no such clearance had been issued at the time and in fact has not been issued to date. Furthermore, the notion that the specifications could not be revised is in direct contravention to [a government September 2012 letter] that had directed the . . . Mechanical Specifications be revised and resubmitted.

ECCI resubmitted the proposed HVAC equipment product data with its position clearly stated in response to the Government comments. On 10 August 2012 USACE once again [] disapproved the proposed equipment . . . . ECCI informed USACE of the intention to resubmit selected Mechanical specs thus aligning it with contact [sic] requirements.

The Government [in August and September 2012] reiterated its demand for UL listed material . . . .

ECCI continued to maintain that the disapproval of our proposed equipment on the basis that it is 1) not UL listed nor tested . . . and 2) R-22 refrigerant is not allowed, was not consistent with the contract requirements.

. . .

[On November 16, 2012, ECCI] provided revisions to the 100% mechanical specs and further clarified our position regarding ECCI's contractual right to correct the mechanical specifications by responding to each Government statement . . . .

(R4, tab 75 at 44-45 (alterations and bracketed material added)) ECCI provided the following excerpt of its November 16, 2012 letter to the government:

*Our designer erred in including the UL . . . and R-410 requirements in our 100% specifications. The last Government review of our Mechanical design submittal resulted in direction to resubmit. We have therefore corrected the errors in the specifications . . . .*

*Further, there is no language in the contract that states the more rigorous HVAC requirements between conflicting*

12

> *Contractor developed specifications and original contract requirements take precedence. In fact [the contract] indicates that design products actually have the lowest precedence.*
>
> . . .
>
> *Therefore, if we have inadvertently or mistakenly included provisions in our design that are not contract requirements, those erroneous requirements are not binding and correcting them is perfectly reasonable and allowed . . . .*

(R4, tab 75 at 45 (italics in original, bracketed material added)) In its May 2, 2014 submission to the contracting officer, ECCI further states:

> [In September and November 2012,] ECCI once again presented its position that UL and R410 criteria had been mistakenly incorporated into the specifications by its design team and that the specifications were not binding since ECCI, as the design-build contractor, was responsible for correcting the errors in the design specification in accordance with the terms of our contract.
>
> . . .
>
> Further, USACE approved R22 units for all split pack units located throughout the project and their unreasonable disallowance of R22 equipment for the large HVAC systems served no purpose but to increase ECCI's costs, delay the project and complicate the maintenance and operations functions of the facility.
>
> . . .
>
> The Government once again forbid ECC [sic] to revise its specification and continued to direct the use of UL listed material with R410 refrigerant.
>
> . . .
>
> Subsequently, two meetings were held [in November 2012] between ECCI management and [government officials] to

13

address this and other issues.  At the second [November 30, 2012] meeting USACE explicitly directed for the first time for ECCI to provide UL equipment with R410 refrigerant.

[On November 20, 2012, ECCI] acknowledged the USACE direction to proceed with UL / R410 equipment and stated ECCI would be submitting [a Request for Equitable Adjustment] regarding this issue. . . .  ECCI quickly assembled a new construction submittal package proposing UL listed Carrier HVAC equipment and submitted it on 8 December 2012 . . . .

However, despite the fact that the product data submitted clearly showed the equipment was UL listed and used R410 refrigerant . . . [,] the reviewer unreasonably rejected the submittal.  After taking 55 days for its review, USACE had not conducted any technical review of the proposed equipment and unreasonably disapproved the submittal because of just three issues . . . .  One comment pertained to the format of the submittal and, incredibly, two pertained to references to R22 and CE compliant equipment in the previous mechanical specifications that had not yet been revised.  No technical comments were provided.  Following the resubmission of the same product data . . . , the Government finally approved the proposed Carrier HVAC product data on 7 March 2013.

The total caused by the unreasonable and improper direction to use UL listed equipment with R410 refrigerant caused a 267 day delay between the unreasonable disapproval of ECCI's first construction submittal on 13 June 2012 and the eventual approval of the Carrier products on 7 March 2013.

However, *subsequent to the Government's direction to accelerate and phase the turnover of facilities, ECCI determined it was unable to use the approved Carrier brand and had to switch to more expensive Aaon and Trane units in order to meet the Government's directive to accelerate and phase the turnover of facilities*.  In fact ECCI had to issue [a] stop work order to Carrier after making a 30% advance payment against the Purchase Order issued on 27 Mar 13. ECCI informed USACE of the additional costs associated the Government would incur [sic] as a result of changing the

14

HVAC suppliers at the weekly . . . conference call on 8 May 2013.  The Contracting Officer [and other government officials] were on the call and all agreed the change was necessary.

(R4, tab 75 at 47-48 (emphasis, alterations, and bracketed material added))

We find that the above constitutes at least two sets of materially different, unrelated operative facts concerning:  (1) the government's alleged direction that ECCI use UL listed equipment with R410 refrigerant; and (2) the government's alleged direction to accelerate and phase the turnover of facilities, resulting in an alleged decision by ECCI to switch from providing Carrier HVAC units to other, more expensive units.[4]

8.      *Server Cabinets and Relay Racks*

In its submission to the contracting officer, ECCI makes a request for $135,270.33 for "the additional material and shipping costs associated with the Government's misapplication of TEMPEST requirements and unreasonable issuance of the unilateral modification for Communications Building Server Cabinets and Racks" (R4, tab 75 at 25-30).  ECCI quotes from what it says is its letter to the government:

> *"The communications system reviewer is maintaining all requirements associated with meeting a TEMPEST accreditation in the SCIFs, including maintaining <u>one meter separations between the different communications systems,</u> are required.  However, TEMPEST countermeasures are not mandated for continuously operated SCIFs as we confirmed in our letter . . . of 31 March 2011 . . . .  That letter provided the basis for our proposal for the change of SCIF requirements . . . .  In regard to SCIF accreditation checklist . . . we stated 'We have assumed facility does not require TEMPEST countermeasures.'  The modification was issued in the exact amount of our proposal without negotiations or clarification requests from the Government."*

(R4, tab 75 at 25 (italics in original, underscored emphasis added))  In its submission, ECCI further states:

---

[4] Because of our decision below, we need not decide whether these two sets of facts themselves contain, within each of them, more than one set of materially different, unrelated operative facts.

15

The Government requested ECCI's assumptions with its proposal to ensure the scope of the modification was clear to both ECCI and the Government before its issuance. Since it was issued based on those assumptions, the assumptions are clearly incorporated by the issuance of the modification. However, the Contracting Officer's response . . . stated:

> "The design is required to conform to **the most stringent TEMPEST requirements, including the 1 meter separation between equipment racks,** as well as other TEMPEST separation distances and controls area design requirements."

ECCI proceeded with the direction in the Contracting Officer's . . . letter, however, we continue to maintain the contract, as modified, does not require application of the **"most stringent"** TEMPEST requirements nor does it require one meter separation between all equipment racks. First, ECCI continues to maintain that Modification A0004 deleted any TEMPEST countermeasure requirements in SCIFs based on ECCI's clarifications regarding the modification's scope and the Government's acceptance of those clarifications. However, notwithstanding any impact on TEMPEST requirements from the modification, the original contract does not require **"the most stringent TEMPEST requirements, including the 1 meter separation between equipment racks"** as directed by the Contracting Officer.

. . .

*The Government's direction to separate all relay racks by one meter significantly compounded the problem of fitting the racks into the communications rooms.* Communications room layouts for racks, ladder racks, etc. required continual revisions and to such an extent that in Building J ECCI actually had to change from floor mounted relay racks to wall mounted racks.

(R4, tab 75 at 25-27) ECCI continues:

> *Additionally, . . . the communications system design reviewer continued to direct ECCI to provide the Communications Building server cabinets and racks that ultimately the*

16

*Government agreed were not in our contract.*  After several exchanges of ProjNet comments and official correspondence, the Government finally conceded the work was <u>not</u> in our contract, and . . . stated a modification would be required.  An RFP was issued . . . .  ECCI submitted its original proposal . . . .

ECCI was then required to revise its proposal because the Government communications system design reviewer inappropriately disapproved ECCI's original server cabinet and relay rack construction submittals.  <u>The Government directed ECCI to re-price its proposal using a Government specified cabinet from Black Box instead of the less expensive, contract compliant Chatsworth cabinets ECCI had originally intended to use</u>.

. . .

The modification was not issued for three months after it was negotiated.  While ECCI had previously agreed to the pricing adjustment in the modification that was ultimately unilaterally issued . . . , the delay in preparation of the modification by the Government made the schedule and pricing impacts estimated by ECCI obsolete.  Moreover, ECCI was concerned about the impact the modification would have on the relay racks that were required under the original contract, which would now have to match the cabinets the Government directed in this modification.  ECCI clearly expressed its concern regarding impact on the relay rack requirements during the negotiations, during which the Government agreed to include language in the modification that would recognize ECCI's right to request a contract adjustment for any impact of the server cabinets directed in this modification on the cost and time associated with the relay racks required by the original contract.  When the Government sent the modification for ECCI's signature three months later, however, such language was not included as previously agreed.  Instead, the standard closing statement was included essentially barring ECCI from pursuing an REA.  Because of these reasons, ECCI did not agree with the modification and requested a provision be added . . . addressing ECCI's concerns as originally agreed during the negotiations.  The [government] responded:

17

> *"Your request makes no sense. This is a modification. As such, the contractor and the Government negotiate the price of what needs to be delivered based on the contractor's costs. If you were directed to obtain specific items, as you claim, then that cost ought to be part of your proposal and it gets negotiated. **Mod gets executed based on what was negotiated.** End of story."*

(R4, tab 75 at 27-28 (italics and bolded material in original, underscored emphasis added)) ECCI further states that after urging ECCI to sign the modification, the government eventually issued the modification unilaterally, "incorporating ECCI's obsolete pricing and schedule impacts and failing to include the provision USACE originally agreed to include" (R4, tab 75 at 30). ECCI continues:

> This issue served to generate numerous Government comments and back check comments directing ECCI to reflect the desired system in the design before it was added to the contract by modification. This in turn served to increase the cost of subsequent communications system design submittals. This issue also postponed ECCI's ability to procure not only the server cabinets added by the modification, but also the relay racks in the original contract, which were changed by the modification, which ultimately necessitated air freighting the cabinets at a significantly higher cost than anticipated. Further, the cabinets specified by the Government were 45 U high cabinets when the contract, changed by P0007, required only 42U high relay racks. Therefore, the unilateral modification did not adequately adjust contract time or price and increased the procurement cost of relay racks that [the government] refused to address with the modification previously agreed to.

(R4, tab 75 at 30 (alterations added))

We find that the above constitutes two sets of materially different, unrelated operative facts: one concerning the government's alleged direction to separate all relay racks by one meter, and one concerning the government's alleged direction that ECCI provide server cabinets and racks not required by the contract.

18

9.     *Ladder Cable Tray Around the Entire Perimeter of Communications Rooms and Overhead Cable Tray in Tactical Operations Center (TOC)*

In its submission to the contracting officer, ECCI makes a request for $153,307.02 for alleged "additional work associated with the additional ladder rack and overhead cable tray in the TOC building" (R4, tab 75 at 22-25).  ECCI states:

> [T]he communications system design reviewer[] continued to insist that cable ladder rack was required around the **entire** perimeter of all telecommunications rooms . . . .  Our design showed ladder rack routed around the perimeter of the telecommunications rooms **as necessary** to serve the cabinets/racks . . . .
>
> . . .
>
> Conservatively speaking, the amount of ladder rack installed project wide doubled over the contract required amount because of the communications system design reviewer direction.
>
> Project wide, the additional work associated with the additional ladder rack and the overhead cable tray in the TOC building discussed previously in relation to additional outlets resulted in the below direct cost increase . . . .

(R4, tab 75 at 22-25 (emphasis in original))  We find that the above constitutes two sets of materially different, unrelated operative facts:  one for "additional work associated with the additional ladder rack," and one for "the overhead cable tray in the TOC building."

## DECISION

ECCI has the burden of proving the Board's jurisdiction by a preponderance of the evidence, including that it presented to the contracting officer a claim, which, in the case of a demand for money, must be stated in a sum certain.  *See Naseem Al-Oula Co.*, ASBCA No. 61321 *et al.*, 20-1 BCA ¶ 37,490 at 182,148.  We also have an independent obligation to determine our own jurisdiction.  *See Stobil Enters. v. Dep't of Veterans Affairs*, CBCA No. 5246-R, 17-1 BCA ¶ 36,610 at 178,323.  To the extent that any of the bases of our jurisdictional determinations go beyond the arguments that the parties have briefed, the parties may request reconsideration.  *See id.*

19

We determine whether a contractor's submission is a claim on a case-by-case basis, applying a common sense analysis. *ECC Int'l Constructors, LLC* (*ECCI*), ASBCA No. 59586, 21-1 BCA ¶ 37,862 at 183,854. Identifying what constitutes a separate claim is important. *Id.* The jurisdictional standard must be applied to each claim, not an entire case; jurisdiction exists over those claims that satisfy the requirements of an adequate statement of the amount sought and an adequate statement of the basis for the request. *Id.* at 183,854-55. Congress did not intend the word "claim" to mean the whole case between the contractor and the Government, but, rather, that "claim" means each claim under the Contract Disputes Act (41 U.S.C. §§ 7101-7109) for money that is one part of a divisible case. *Id.* at 183,855. The requirement that a claim adequately specify both the amount sought and the basis for the request means that requests involve separate claims if they either request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally. *Id.* This approach, which has been applied in a practical way, serves the objective of giving the contracting officer an ample, pre-suit opportunity to rule on a request. *Id.*

Claims seeking different types of remedy, such as expectation damages versus consequential damages, are different claims. *Id.* Presenting a materially different factual or legal theory (e.g., breach of contract for not constructing a building on time versus breach of contract for constructing with the wrong materials) creates a different claim. *Id.* We must go beyond the face of claims to make these distinctions. *Id.* For example, although there may be a common type of fact involved in a contractor's various extended overhead claims (i.e., a cause of delay), that does not necessarily mean that each claim involves proof of a common or related set of operative facts. *Id.* Such a "factual thread" is not determinative of whether there is only a single, unitary extended overhead claim. *Id.*

Consequently, a contractor's monetary claim must not only state a bottom-line sum certain for the overall claim, it must also state a sum certain for any distinct claim component within the overall claim. *Id.* If no sum certain is specified, the contracting officer cannot settle the claim by awarding a specific amount of money, because such a settlement would not preclude the contractor from filing suit seeking the difference between the amount awarded and some larger amount never specifically articulated to the contracting officer. *Id.*

Above we have found that each of the following purported claims (the government's jurisdictional challenge to which comprises the whole of the government's motion to dismiss), which ECCI presented to the contracting officer as single claims, consists of more than one set of materially different, unrelated operative facts, and therefore consists of more than one "sub-claim," for which sub-claims ECCI did not provide the contracting officer separate sums certain: (1) Additional Outlets and Changed Configurations; (2) Additional and Changed Flexible Metal Conduit; (3) Legrand Raised Floor Communications Outlets; (4) 144 Port Fiber Optic

Combination Units; (5) Trunk and Splice OSP Configuration, (6) Changed Direction Regarding Design and Provision of UPS System; (7) UL/R410 HVAC and Change to Accommodate Schedule; (8) Server Cabinets and Relay Racks; and (9) Additional Ladder Rack and Cable Tray. Because ECCI did not specify for the contracting officer those separate sums certain, the Board does not possess jurisdiction to entertain those nine purported single claims, which are, consequently, dismissed from the appeal.

Citing *Phi Applied Physical Sciences, Inc.*, ASBCA No. 56581, 13 BCA ¶ 35,308 at 173,337, ECCI invokes the rule that the sum certain requirement is met if the sum, although not expressly totaled by the contractor, "is readily calculable by simple arithmetic" (app. opp'n at 31-32), saying that:

> [T]he Government could have determined the sum certain attributable to any of the alleged sub-sub-claims via simple math using the PDF cost documentation included in ECCI's claim. For each alleged sub-sub-claim, the Government needed only to add up the relevant quantities for a particular issue, and then apply the relevant unit pricing for those items.

(App. opp'n at 31-32) In support of that position, ECCI refers the Board to the affidavit of Scott A. Hayward, who describes, referencing spreadsheets from ECCI's submission to the contracting officer, how he says the sums certain for sub-claims can be calculated (app. opp'n at 31-32, ex. 1 at ¶¶ 5-31 (citing R4, tab 75 at 87-117, tab 321)). Having reviewed that affidavit and those spreadsheets, we disagree that sums certain for the sub-claims at issue are readily calculable by simple arithmetic. Rather, as the government points out (gov't reply at 32), ECCI offers calculations like the following:

> To calculate the costs associated with the additional outlets due to "rounding up," you would: 1) in Additional Changed Outlets worksheet, zero out all items in Cells E6-L263 other than those in Rows 6-40, 140, 177-185, 204 and 245; 2) in the Outlet Quantities worksheet, zero out all items in Cells B23-Q181 except those in Rows 23, 96, 120, 134 and 169; and 3) in the Added Outlet Pricing worksheet, delete the entry in Row 19, with the total direct cost of $143,155.58 in Cell J20. After adding G&A and profit, the total sum is $165,974.25.

(app. opp'n, ex. 1 at 6 ¶ 27) That is not simple arithmetic. *Cf. Taj Al Rajaa Co.*, ASBCA No. 58801, 14-1 BCA ¶ 35,522 at 174,104 ("Since the alleged contract specified the monthly unit price of $2,516, by simple arithmetic the claim amounted to $25,160."); *Mulunesh Berhe*, ASBCA No. 49681, 96-2 BCA ¶ 28,339 at 141,520 (simple multiplication of lease rental rate by number of months resulted in sum certain); *Dillingham Shipyard*, ASBCA No. 27458, 84-1 BCA ¶ 16,984 at 84,612 (sum certain

21

determinable by multiplying hourly rate by claimed hours). ECCI fails to demonstrate that the sums at issue are readily calculable by simple arithmetic. *See ECCI*, 21-1 BCA ¶ 37,862 at 183,856 (citing cases).

## CONCLUSION

The government's partial motion to dismiss for lack of jurisdiction is granted, and the purported claims identified above are dismissed from the appeal.

Dated:  November 9, 2021

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59643, Appeal of ECC International Constructors, LLC, rendered in conformance with the Board's Charter.

Dated: November 10, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

23